UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
KEVIN LOUIS,

                            Petitioner,

-against-

PHILIP D. HEATH, SUPERINTENDENT,
SING SING CORRECTIONAL FACILITY,

                            Respondent.
----------------------------------------------------------------x

**MEMORANDUM & ORDER**

12-CV-4900 (SLT)

**TOWNES, United States District Judge:**

*Pro se* petitioner Kevin Louis ("Petitioner") brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his conviction for one count of rape in the first degree, one count of burglary in the first degree, and two counts of endangering the welfare of a child. Petitioner contends that he was deprived of his constitutional rights to due process and equal protection when a juror, Leesa Building, was seated despite his *Batson* challenge. For the reasons set forth below, the petition for habeas corpus relief is denied.

## BACKGROUND

In the early morning of May 15, 1994, a woman named Shirlene G. was raped in her bedroom at 631 Lefferts Avenue in Brooklyn, New York. Portions of the incident were witnessed by Shirlene's two young children, who were in the living room when the rape occurred. Shirlene called 911 immediately after the rapist left, and told the police what happened and described her assailant. Shortly thereafter, Shirlene was taken to Kings County Hospital, where a rape kit containing hair and vaginal secretion samples was prepared.

One of the vaginal swabs in Shirlene's rape kit contained sperm. However, DNA testing was not performed upon the sperm until 1999, almost five years after the incident. A laboratory was able to generate a full DNA profile of the assailant, which was then entered into a database.

Based on this profile, an indictment was issued, charging "John Doe" with rape in the first degree, sexual abuse in the first degree, burglary in the first and second degrees, assault in the second and third degrees, sexual misconduct, and two counts of endangering the welfare of a child.

In 2006, Petitioner was arrested for an unrelated crime to which he pled guilty. As a result of this conviction, Petitioner was required to provide a DNA sample, which was also entered into the database. Petitioner's DNA matched the DNA recovered from Shirlene's rape kit and in December 2007 Petitioner was charged with being the John Doe who attacked Shirlene.

**A. Jury Selection**

Jury selection for Petitioner's trial commenced on September 10, 2008, in the Supreme Court of the State of New York, Kings County. Jury selection took the better part of two days. In each of five rounds, the trial judge seated thirteen or fourteen venirepersons in the jury box and had them answer questions, some of which were contained in a questionnaire, designed to probe their qualifications to serve. Those venirepersons who were not excused for cause were then questioned by the attorneys.

In the first round, one of the fourteen venirepersons was Leesa Building ("Mr. Building"), the only juror at issue herein. (T. 30.)[1] Mr. Building was asked by the trial judge if he had any familiarity with the area of Brooklyn in which Shirlene was attacked. Mr. Building told the court: "I'm living like one block from Lefferts Avenue . . . maybe a few blocks over [from 621 Lefferts]." (T. 39.) He proceeded to tell the trial judge that this proximity would not affect his ability to sit on the case. When asked if he could "decide this case solely on ... the

---

[1] Numbers in parentheses preceded by "T." denote pages in the trial transcript.

evidence in this case, and not what ... [he] might know about the area," Mr. Building replied, "[r]ight." (T. 39-40.)

Later in the round, Mr. Building read his responses to the jury questionnaire in open court as follows:

> Mr. Building: My name is Leesa Building. 58 years old. I'm living in Crown Heights. I have a year of college. I'm a mailman for 19 years. Married but separated. I have children. My interests, I go to church. I read all the newspapers.
>
> The Court: Okay. Any friends or relatives in law enforcement: Police officers, judges, lawyers?
>
> Mr. Building: No.
>
> The Court: Any opinion about the criminal justice system: Judges, lawyers, defendants ... which would affect your ability to be fair?
>
> Mr. Building: No.
>
> The Court: Anyone ever been the victim of a crime: You, a family member or friend?
>
> Mr. Building: Well, when I was 16 years old back home, one of my cousin got killed by jealousy by another girl. That was like 30 years ago.
>
> The Court: Do you think knowing about that circumstance would ... affect your ability to sit on this case?
>
> Mr. Building: No. (T. 50-51.)

The Court subsequently asked about Mr. Building's prior jury service. Mr. Building told the Court that he had been called for jury duty, but had never been empaneled because he had "excuses." (T. 52.) The Court asked Mr. Building no further questions and moved on to the next prospective juror.

Once the remaining potential jurors had finished reading from their questionnaires, the trial judge excused the venirepersons from the courtroom and began to question those

3

prospective jurors who had asked to speak with him privately. Mr. Building was one such prospective juror. Mr. Building told the trial judge that he was a diabetic, and asked if he would have time to go to the bathroom if needed. (T. 74.) The judge assured Mr. Building that the court would take breaks to accommodate him. Neither the defense nor the prosecution questioned Mr. Building at this time.

At the time of the first round, the prosecution exercised three peremptory challenges, striking Mr. Building and two other African Americans. The defense exercised five peremptory challenges. Five jurors were empanelled. (T. 118-19.)

In the second round, another fourteen prospective jurors were seated, four of whom were subsequently excused on consent of both parties. (T. 121, 150, 155.) The prosecution peremptorily struck five prospective jurors, including two African Americans and one Hispanic. (T. 172-73.) The defense exercised four peremptory challenges, and only one juror was selected. (T. 172-73.)

Round three began the next day with the seating of thirteen prospective jurors. Of these, seven were excused on consent of both parties, including one person who had diabetes and feared his condition would disrupt the proceedings. (T. 239.) The prosecution then exercised two peremptory challenges, both against African Americans. The defense exercised peremptory challenges against the remaining four venirepersons. (T. 268.)

In the fourth round, fourteen prospective jurors were seated. (T. 273.) When the round was completed, the Court asked for challenges to the first seven jurors in the box. (T. 368.) Neither side raised any challenges for cause. (T. 368-69.) The prosecution then exercised peremptory challenges against two prospective jurors—Marcia Mullings and Keisha McLean—both African-American women. (T. 369.)

4

At this point, Petitioner's trial counsel, Mr. Andreadis, asserted a *Batson* challenge:

> Mr. Andreadis: Judge, I am going to assert a *Batson* challenge here. There has been a pattern, we are now in the fourth round, and in every round, every round, the People---first round they knocked off three African-Americans, in the second round it was two African-Americans and one Hispanic, in the third round it was two African-Americans and again now in the fourth round two African-Americans. It's happening each and every round.
>
> The Court: I don't want to shortchange any of this but, Ms. Schmidt, let's assume for the moment he's made out a prima facie case, why don't you explain to us why you challenged these two people. (T. 369.)

Assistant District Attorney Schmidt responded by stating that she had challenged Ms. Mullings and Ms. McLean because they both had relatives who had been involved with the criminal justice system. The prosecutor claimed that Ms. Mullings had testified that her son had been "wrongfully arrested" for gun possession, while Ms. McLean's brother had been incarcerated for weapons possession and subsequently violated on parole. The trial judge did not ask defense counsel to comment on these reasons, but indicated that he was inclined to accept those reasons as non-pretextual by stating:

> Mr. Andreadis, I don't mean to---I am not trying to shortchange the process, but it's clear those two jurors indicated that they had relatives who had contact with the criminal justice system in this county, so to speak, and, you know, she wasn't taking the chance---she is not taking a chance. They're raising two reasons, she's going to challenge them, and she did.

When defense counsel retorted that Ms. Mullings and Ms. McLean were "only two" of several minority jurors who had been peremptorily challenged by the People, the Court asked Mr. Andreadis to identify the other jurors. Mr. Andreadis began by discussing "Juror number four" in the "[v]ery first round," who the judge then identified by name. (T. 372.) Although the juror was actually Mr. Building, the court reporter recorded the name phonetically as "Belden" and that name was used throughout the transcript. Mr. Andreadis also named the other two

5

venirepersons against whom the People had exercised peremptory challenges in the first round: Ms. Washington and Ms. Young.

The trial judge then turned to the prosecutor, who provided her reasons for challenging Mr. Building:

> Ms. Schmidt: Mr. Belden, he asked to speak with you privately because he wanted to know if he could use the bathroom. He didn't appear very educated. That was my reason. Considering you have scientific evidence, I didn't know if he had some kind of problem.
>
> The Court: He did. He was a diabetic. He clearly was a diabetic.
>
> Ms. Schmidt: He didn't appear very educated. That's what I have. He goes to church. I didn't---the fact that---you know, I just didn't---those are my reasons. (T. 373-74.)

After the prosecutor gave her race-neutral reasons for challenging Ms. Washington and Ms. Young, the judge turned to defense counsel, saying, "Mr. Andreadis?" However, defense counsel made no effort to prove that the prosecutor's reasons were pretextual. Rather, because comments made by the trial judge implied that he was likely to deny the *Batson* challenge, defense counsel refused to continue, saying:

> Mr. Andreadis: Judge, you already found more than or half of them to be at least race neutral. I assume you are going to deny my challenge.
>
> The Court: Protect your record. You want to go on---
>
> Mr. Andreadis: That is fine. I don't think because someone is a diabetic, in fact, is a reason. It is a health issue, it is certainly not a reason to---you don't dismiss people from jury duty for that or knocking people off because they don't seem educated. Then we'd need to make college education a requirement for jurors.
>
> Ms. Schmidt: Mr. Belden, who didn't seem well educated---
>
> The Court: He indicated he had a special medical need. He stood there and said it. And that's what Ms. Schmidt pointed to initially, although the Court has indicated, if you got a problem, we'll work around it. It's her call on that issue.

6

> Mr. Andreadis: That is fine, Judge. Let's proceed. Let's pick the jury. (T. 375-76.)

After this colloquy, the defense peremptorily struck prospective juror number 5, and the three remaining jurors in seats 1-7 were empaneled. (T. 377.) As to the remaining seven prospective jurors, none were challenged for cause, the prosecution exercised an additional two peremptory strikes, and the defense exercised its final strike. (T. 378-79.) As a result, there was a full twelve-person jury at the end of round four. (T. 379.) In the fifth and final round, the parties, by agreement, sat three jurors as alternates without conducting a full *voir dire*. (T. 417.) Petitioner's trial commenced the next day, September 12, 2008. (T. 421.)

## B. Procedural History

The jury announced their unanimous verdict on September 17, 2008, finding Petitioner guilty of rape in the first degree, burglary in the first degree, and two counts of endangering the welfare of a child. On October 20, 2008, the trial judge sentenced Petitioner to consecutive terms of imprisonment of 8 1/3 to 25 years on the burglary count and 8 1/3 to 25 years on the rape, and to two concurrent one-year terms on the child welfare counts. (T. 835.)

On appeal, Petitioner raised only one issue: that the trial judge denied his due process and equal protection rights by permitting the prosecution to exercise a peremptory challenge against Mr. Building. Petitioner did not argue that the prosecution's stated reasons for challenging Mr. Building were not race-neutral. To the contrary, Petitioner conceded that "[c]ourts have allowed challenges based upon a prospective juror's level of education, at least when the prosecutor can show why a minimal level of education is relevant," (Petitioner's Appellate Division Brief at 18), and that "concern that a prospective juror's medical condition might interfere with [the] ability to serve is a legitimate basis for a peremptory challenge." (*Id.* at 15.) Rather, Petitioner argued that

the reasons given by the prosecution were "obvious pretexts for racial discrimination." (*Id.* at 11.)

First, Petitioner asserted that it was "not at all clear" that concerns about Mr. Building's health prompted the prosecutor to challenge him, even though "the court and defense counsel both assumed that this was what the prosecutor was getting at in her first stated reason for the challenge of Building." (*Id.* at 15.) Petitioner theorized that the prosecutor "merely thought it inappropriate or peculiar that Building would ask for a private conference with the court to discuss the matter of his access to the bathroom," and characterized this as the "sort of 'outlandish' explanation that should be rejected on its face." (*Id.* at 16.) Second, Petitioner asserted that the prosecutor challenged Mr. Building because he went to church. While Petitioner conceded that religious beliefs which interfered with the deliberative process might be a legitimate basis for challenging a prospective juror, Petitioner noted that the prosecutor had not asked about the nature of Mr. Building's religious beliefs. Third, while conceding that a lack of education could justify challenging a prospective juror, Petitioner argued that "[s]kepticism" regarding this reason was "in order" because the other two reasons articulated by the prosecutor were "clearly pretextual," raising an "inference that this one was as well." (*Id.* at 19.) Petitioner implied that the prosecution had no basis to judge Mr. Building's capacity for understanding the DNA evidence because she never asked him any questions about it, and faulted the prosecutor for failing to specify the level of education she considered necessary for the case. (*Id.*)

On May 31, 2011, the Appellate Division, Second Department affirmed the conviction on the merits, stating: "Contrary to the defendant's contention, the Supreme Court properly denied his *Batson* challenge, as he failed to carry his burden of proving that the prosecutor's facially race-neutral explanations for exercising a peremptory challenge to the subject juror were pretexts

8

for purposeful discrimination." *People v. Louis*, 84 A.D.3d 1410, 923 N.Y.S.2d 909 (N.Y. App. Div. 2011) (internal citations omitted). On August 9, 2011, the Petitioner's application for leave to appeal to the Court of Appeals was denied by Judge Robert Smith. *People v. Louis*, 17 N.Y.3d 818, 954 N.E.2d 98 (N.Y. 2011).

Petitioner, proceeding *pro se*, commenced the instant action in September 2012 by filing a completed form entitled, "Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody." The only ground for habeas corpus relief raised in that petition was the *Batson* issue which had been raised on direct appeal. Specifically, petitioner contends that his due process and equal protection rights were violated when his *Batson* challenge was unreasonably denied, as the Prosecution's stated reasons for challenging Mr. Building were "obvious pretexts for racial discrimination." (Petition for Writ of Habeas Corpus, September 28, 2012, at 15.)

In April 2014---after the response to the petition and petitioner's traverse had been filed but before the Court ruled on the merit of the petition---Petitioner moved for permission to amend his petition to add issues which he had exhausted in State court subsequent to the filing of the petition. In a memorandum and order dated November 5, 2014, but filed November 7, 2014, the Court granted Petitioner's motion and set a briefing schedule which required that the amended petition be filed on or before December 1, 2014. Although the docket sheet indicates that a copy of this memorandum and order was mailed to petitioner, petitioner has yet to file his amended petition.

## DISCUSSION

### A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, if a claim was "adjudicated on the merits" in state court, the writ shall issue only if the federal court concludes that the adjudication of the claim: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. 2254(d). "A state-court decision is 'contrary to' clearly established federal law ... if the state court's conclusion on a question of law is opposite to that of the Supreme Court ...." *Brown v. Alexander*, 543 F.3d 94, 100 (2d Cir. 2008) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). Alternatively, "[a] state-court decision involves 'an unreasonable application of' clearly established Federal law" when it "'identifies the correct legal principle from the Supreme Court's decisions but unreasonably applies that principle to the particular facts of a prisoner's case.'" *Id.* (quoting *Williams*, 529 U.S. at 413). The unreasonable application must have been more than simply "incorrect or erroneous," it must have been "objectively unreasonable." *Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001).

When a petitioner challenges the factual basis for a prior state-court decision rejecting a claim, the petitioner bears the burden of rebutting the state court's factual findings by clear and convincing evidence. *Burt v. Titlow*, --- U.S.---, 134 S.Ct. 10, 15 (2013). "[A] state-court factual

10

determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Rather, "AEDPA requires 'a state prisoner to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error beyond any possibility for fairminded disagreement.'" *Burt*, 134 S.Ct. at 16 (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)). As the Supreme Court has observed, "[t]his is a difficult to meet ... and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, ---U.S.---,131 S.Ct. 1388, 1398 (2011) (internal quotations and citations omitted).

## B. The Clearly Established Law of *Batson v. Kentucky* and its Progeny

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court established that "[p]urposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Batson*, 476 U.S. at 86. Accordingly, *Batson* held that "[t]he equal Protection Clause guarantees the defendant that the State will not exclude members of [the defendant's] race from the jury venire ..." *Id.* The *Batson* Court also recognized that "[t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community." *Id.* at 87. Thus, in *Powers v. Ohio*, 499 U.S. 400 (1991), the Supreme Court established that, under *Batson*, "the racially discriminatory peremptory challenge of one juror, standing alone, violates the Equal Protection Clause." *Green v. Travis*, 414 F.3d 288, 297 (2d Cir. 2005); *see also Walker v. Girdich*, 410 F.3d 120, 123 (2d Cir. 2005) ("[U]nder *Batson* and its progeny, striking even a single juror for a discriminatory purpose is unconstitutional").

11

*Batson* "fashioned a three-part burden-shifting framework that trial courts are to employ when ascertaining whether a particular peremptory strike of a jury panelist is based on an impermissible discriminatory motive...." *Messiah v. Duncan*, 435 F.3d 186, 194 (2d Cir. 2006). First, the court must determine that the defendant has established a *prima facie* case of discrimination. *See Batson*, 476 U.S. at 96-97. In order to do so, the defendant must produce "evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Jones v. West*, 555 F.3d 90, 96-97 (2d Cir. 2009) (quoting *Johnson v. California*, 545 U.S. 162, 170 (2005)).

Second, if the defendant is successful in making out a *prima facie* case, the burden shifts to the prosecutor to provide a race-neutral reason for exercising the peremptory strike. *Id.* at 97. This is not a cumbersome burden. "At this stage, proffered explanations are deemed valid unless discriminatory intent is inherent in the challenged party's explanation." *United States v. Martinez*, 621 F.3d 101, 109 (2d Cir. 2010). "Even if the reasons the prosecution provides are neither 'persuasive, [n]or even plausible,' as long as those reasons are facially valid, the burden will then switch to the defendant to prove that the reasons the prosecution gave are a pretext for purposeful discrimination." *Majid v. Portundo*, 428 F.3d 112, 126 (2d Cir. 2005) (quoting *Purkett v. Elem*, 514 U.S. 765, 767-68 (1995)).

Finally, under the third prong of *Batson*, the trial court must consider "all facts and circumstances" and determine "whether the defendant has carried his burden of proving purposeful discrimination." *United States v. White*, 552 F.3d 240, 250-51 (2d Cir. 2009) (citing *United States v. Thompson*, 528 F.3d 110, 115 (2d Cir. 2008)). "Ordinarily, at step three, 'the decisive question will be whether the race-neutral explanation for a peremptory challenge should be believed'" after hearing both parties' positions on the issue. *Messiah*, 435 F.3d at 195

(quoting *McKinney v. Artuz*, 326 F.3d 87, 98 (2d Cir. 2003)). This "ultimate question of discriminatory intent represents a finding of fact," since "a court's determination will often turn on the judge's observations of prospective jurors and the attorneys during *voir dire* and an assessment of their credibility." *White*, 552 F.3d at 251 (internal quotation marks omitted). As a result, the trial court's findings will be afforded "great deference." *Hernandez*, 500 U.S. at 364.

In this case, the Court need not consider the issue of whether Petitioner made a prima facie showing that the prosecution exercised its peremptory challenges on the basis of race. The trial court assumed that Petitioner had done so, and asked the prosecution for race-neutral reasons for exercising the peremptory challenges. Once the prosecution proffered race-neutral reasons and the trial court ruled on the ultimate question of whether those reasons were pretexts for discrimination, the question of whether Petitioner had made a prima facie showing became moot. *See Hernandez*, 500 U.S. at 359.

There is also no question as to whether the prosecution articulated race-neutral reasons for challenging Mr. Building, the only juror at issue in this case. There is some confusion regarding the reasons offered, however, because the prosecutor was not particularly articulate. She began by noting that Mr. Building had asked to speak to the judge privately about access to the bathroom, then stated:

> He didn't appear very educated. That was my reason. Considering you have scientific evidence, I didn't know if he had some kind of problem. (T. 373.)

Although there is some ambiguity as to whether the "kind of problem" referenced by the prosecutor was a problem understanding scientific evidence or a medical problem, the trial court apparently believed the prosecutor was referencing a medical problem. The judge immediately stated: "He did. He was a diabetic. He was clearly a diabetic." (T. 373). Defense counsel did

13

not question the trial court's interpretation of the prosecutor's statements. Indeed, as Petitioner noted in his appellate brief, defense counsel---like the trial court---"assumed" that the prosecution was asserting that Building's health might interfere with his jury service. (Petitioner's Appellate Division Brief at 15.)

Defense counsel's response to the prosecutor's stated reasons for exercising the peremptory challenge against Mr. Building was also somewhat ambiguous. Mr. Andreadis stated:

> I don't think because someone is a diabetic, in fact, is a reason. It is a health issue, it is certainly not a reason to---you don't dismiss people from jury duty for that or knocking people off because they don't seem educated. Then we'd need to make college education a requirement for jurors. (T. 376.)

It is unclear from this comment whether defense counsel was arguing that the health and education reasons were not race-neutral, or that they were pretexts for discrimination.

To the extent that defense counsel was attempting to argue that the health and education reasons were not race-neutral, that argument lacks merit. "In evaluating the race neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law." *Hernandez*, 500 U.S. at 359. However, "[i]t is well settled that a prospective juror's education level is a recognized race-neutral reason for exercising peremptory challenges." *Robinson v. Smith*, No. 09-CV-8222 (GBD)(AJP), 2011 WL 1849093, at *19 (S.D.N.Y. May 17, 2011) (Report and Recommendation of Peck, M.J.) (citing cases). Similarly, health problems that affect an individual's ability to sit as a juror have been recognized as race-neutral reasons. *See, e.g., United States v. Casper*, 956 F.2d 416, 419 (3d Cir. 1992) (citing cases).

14

Petitioner does not cite to any authority, much less Supreme Court cases, holding to the contrary. In fact, Petitioner expressly conceded on direct appeal that the health and education reasons proffered by the prosecutor were race-neutral. First, Petitioner noted that "[c]ourts have allowed challenges based upon a prospective juror's level of education, at least when the prosecutor can show why a minimal level of education is relevant." (Petitioner's Appellate Division Brief at 18.) Second, Petitioner conceded that "concern that a prospective juror's medical condition might interfere with [the] ability to serve is a legitimate basis for a peremptory challenge." (*Id.* at 15.)

Accordingly, the only issue considered on direct appeal was whether the reasons proffered by the prosecution were pretextual. With respect to this issue, the Appellate Division found that Petitioner had "failed to carry his burden of proving that the prosecutor's facially race-neutral explanations for exercising a peremptory challenge to [Mr. Building] ... were pretexts for purposeful discrimination." *Louis*, 84 A.D.3d at 1410. This was a factual determination which is entitled to "great deference," *Hernandez*, 500 U.S. at 364-65, and which the Petitioner has the burden of rebutting by clear and convincing evidence. *Burt*, 134 S.Ct. at 15.

Petitioner has utterly failed to rebut that factual determination. Petitioner has never articulated any reason to suspect discriminatory intent on the part of the prosecutor in this case. Petitioner's appellate brief did not suggest any reason to question the prosecutor's claim that she wanted a well-educated jury because the People's case relied on DNA evidence, but merely faulted her for failing to articulate minimum educational criteria and failing to question Mr. Building. However, Petitioner does not---and cannot---cite to any authority for the proposition that the prosecution was required to articulate educational criteria, and ignores the fact that the

15

prosecutor had ample opportunity to observe Mr. Building and to hear him discuss his background. Those observations---including the inarticulate manner in which he described his cousin's murder---might have left the prosecutor with an impression of Mr. Building's intelligence which cannot be gleaned from the cold record.

Petitioner has also never articulated a persuasive reason to believe that the prosecutor's comments about Mr. Building's need to use the bathroom were a pretext for discrimination. To be sure, Mr. Building was not incapable of sitting on the jury by reason of his diabetes. However, concerns that a juror's needs might disrupt the trial cannot fairly be characterized as "outlandish." Petitioner's Appellate Division Brief at 16. The prosecutor, whose case relied on complicated expert testimony, was entitled to peremptorily challenge a juror whose medical condition might have necessitated untimely breaks in the trial proceedings. Indeed, the Court notes that the prosecutor had previously consented to dismissing another diabetic venireperson after that prospective juror expressed fears that his condition might interrupt the proceedings.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied. The Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2). In forma pauperis status is denied for purposes of an appeal, as any appeal would not be taken in good faith. 28 U.S.C. § 1915(a)(3); Coppedge v. United States, 369 U.S. 438, 444 (1962). The Clerk of the Court is directed to enter judgment denying the petition and closing this case.

**SO ORDERED.**

/SANDRA L. TOWNES
United States District Judge

Dated: May 29, 2015
Brooklyn, New York